USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-7-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

VERNON LAWSON,                          :

                    Petitioner,         :         **OPINION**

          - against -                   :         09 Civ. 10195 (DC)

UNITED STATES CITIZENSHIP               :
AND IMMIGRATION SERVICES;
ANDREA QUARANTILLO, District            :
Director for New York City,
United States Citizenship and           :
Immigration Services,
                                        :
                    Respondents.
                                        :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**          MATTHEW A. PARHAM, Esq.
                         WILLIAM C. HUGHES, Esq.
                         JOHN G. McCARTHY, Esq.
                           Attorneys for Petitioner
                         125 Broad Street
                         New York, New York  10004

                         PREET BHARARA, Esq.
                         United States Attorney for the
                           Southern District of New York
                           Attorney for Respondents
                             By:  Natasha Oeltjen, Esq.
                                  Joseph N. Cordaro, Esq.
                                  Assistant United States Attorneys
                         86 Chambers Street
                         New York, New York  10007

**CHIN, Circuit Judge:**

          In 2006, petitioner Vernon Lawson applied to be

naturalized as a United States citizen.  Respondent United States

Citizenship and Immigration Services ("USCIS") denied the

application.  Lawson petitions this Court for de novo review of
his application pursuant to 8 U.S.C. § 1421(c).  As the parties
agree, the sole issue presented is whether Lawson is and has been
of "good moral character."  If not, then he will be deported from
the United States.  If so, he may continue to live his life in
this country -- as an American citizen.

Although the focus of the inquiry is the period from
August 4, 2005 to date, Lawson's earlier conduct may be relevant
and must be considered.  In this respect, Lawson has a
substantial strike against him:  in 1985, he killed his wife.
But there were mitigating circumstances.  He had enlisted in the
Marines as a young man and served this country in Vietnam.  As a
result of the pressures he endured in thirteen months of combat,
he developed drug and alcohol addictions and post-traumatic
stress disorder.  After he returned from the war, he received
little support in dealing with the challenges of readjustment.
It was against this background that he lost control in a quarrel
with his wife and killed her.

Lawson was convicted of manslaughter.  He paid his debt
to society, as he served more than thirteen years in prison.
There, he overcame his drug and alcohol problems, earned three
degrees (including two with honors), completed several training

programs, and counseled and taught other inmates.  Upon his release, he obtained gainful employment, and spent eight years as a drug abuse counselor, drawing on his own experiences to help countless individuals deal with their addictions.  He moved back home with his mother and took care of her as her health failed. He went to church every Sunday and regularly volunteered to help in church activities.  He brought food to homeless veterans, played chess in a neighborhood chess club, and tended a neighborhood garden.

"Character cannot be developed in ease and quiet.  Only through experience of trial and suffering can the soul be strengthened, vision cleared, ambition inspired, and success achieved."[1]  Lawson has redeemed himself.  Through the way he dealt with his "experience of trial and suffering," he has shown that he is and has been, since August 4, 2005 and before, of good moral character.  His petition is granted.

## FACTS

The Court held an evidentiary hearing on August 16, 2010.  The following constitute my findings of fact.

---

[1]     Helen Keller, Midstream: My Later Life 401 (Greenwood Press 1969) (1929).

A.    __Lawson Immigrates to the United States__

Lawson was born in Jamaica, to Jamaican national parents, in 1946.  (See GX B at 2; LX 21 at 2; PX A ¶ 3).[2]  Along with his mother and three siblings, he immigrated to the United States as a lawful permanent resident ("LPR") in 1960, at the age of 14.  (Tr. 20).  His father and mother were divorced, and his father remained in Jamaica.  (Id. 98-99).

Lawson and his family moved into the Sugar Hill section of Harlem, and, with certain exceptions discussed below, he has lived there -- in the same apartment -- ever since.  (Id. 22-23; PX A ¶ 2).  He attended junior high school in Manhattan and high

---

[2]    "Tr." refers to the transcript of the hearing on August 16, 2010, and "PX," "LX" and "GX" refer, respectively, to the exhibits attached to the petition, and to Lawson's exhibits and the Government's exhibits marked for the hearing.  Both sides submitted binders at the hearing with pre-marked exhibits. Lawson offered and I received his exhibits 1, 2, 3, 6, 7, 8, 9, 12, 13, and 14.  (Tr. 6, 129, 133).  The Government stated that it had no objection to any of the exhibits attached to the petition, and although I did not do so formally at the hearing, I receive the petition exhibits now.  (Id. 167).  The Government offered at the hearing (and I received) deposition excerpts, but it did not offer any exhibits.  (Id. 166-68).  Nonetheless, I refer herein to a number of the Government's exhibits as well as additional exhibits marked by Lawson but not previously received; these are exhibits that are not controversial or are judicially noticeable, such as Lawson's applications and other documents from the immigration proceedings, documents from the state court proceedings, and scholarly articles and works.  These exhibits are now received.  I have not relied on documents that are otherwise inadmissible hearsay.  (E.g., LX 5).

school in the Bronx.  (Tr. 20-21; PX A ¶ 5).  Hence, New York
City has been Lawson's home for more than fifty years.  (Tr. 22-
23).

**B.   <u>Lawson Serves in the Marines</u>**

In 1964, at the age of 18, Lawson dropped out of high
school and enlisted in the United States Marine Corps.  (<u>Id.</u> 21,
23).  He chose the Marines, as he testified, because "I liked the
spirit of the Marine Corps.  I liked what they stood for."  (<u>Id.</u>
21).

Lawson did one tour of combat duty in Vietnam, for
thirteen months.  (<u>Id.</u> 27).  He served as "an antitank assault
man" and was involved in several operations.  (<u>Id.</u> 26-27).  In
Operation Harvest Moon, while trying to protect a rice crop in
the Qui Nhon province, he and his unit were pinned down by 50-
caliber machine guns for "some days."  (<u>Id.</u> 27).  He described
what happened afterwards:

> [M]e and a fellow Marine was told to go and
> bury a Vietcong that was smelling up the
> place in front of our company, in front of
> the section.  And we went out there to bury
> him, and we lifted him up to put him in the
> little hole that we had dug, his arms came
> off in mine, and it was a horrible experience
> for me that I keep remembering all my life.
>
> Because his body came apart and it was hard
> for me to forget it.

-5-

(Id. 28).[3]  On another occasion, he and other Marines were ordered to keep watch over the body of a "dead Vietcong," which had been put "on display."  (Id. 28).

In other operations, Lawson would regularly go on "sweeps," where he and fellow Marines would be taken by helicopter to locations where they would be subjected to sniper fire and ordered to use flame throwers to burn down thatched homes.  (Id. 28-30).  Carrying the flame thrower up and down hills and in gullies and swamps caused him to sustain three herniated discs; he was required to carry the flame thrower even when he was in pain.  (Id. 88-89).

During Operation Prairie I, Lawson spent three weeks near Khe Sanh close to the Demilitarized Zone.  (Id. 30).[4]  He and other Marines were subjected to "a lot of mortar attacks" as

---

[3]    See Gabrielle M. Neufeld, Historical Division, U.S. Marine Corps, A Chronology of the United States Marine Corps: 1965-1969 7 (1971) ("Thousands of Marines took part in Operation HARVEST MOON, which began in the area between Da Nang and Chu Lai.  During the week-long operation, Marines accounted for 300 Viet Cong dead and captured 50 tons of rice.").

[4]    Neufeld, supra note 3, at 15 ("After 182 days, Operation PRAIRIE I was terminated in Quang Tri province by the 4th Marines with 215 Marines killed and 1,159 wounded.  This operation, which began on 3 August 1966, was the longest and bloodiest Marine engagement of the Vietnam [W]ar up to that time. The enemy lost 1,397 killed and 27 captured.").

well as propaganda broadcast over loudspeakers featuring the voice of someone they called "Hanoi Hannah."  (<u>Id.</u>).[5]

> Lawson described the loss of friends in Vietnam:
>
>> Yes, I lost friends.  I lost friends in Vietnam.  But sometimes when you're in a war and you lose friends, you don't -- you don't even know when they die . . . .  You don't know when they died.  You hear an explosion and you know someone died, but you don't see where they actually died because you might be a quarter mile from where it took place.

(<u>Id.</u> 31).  He lost one friend while they were sitting around playing cards after a sweep.  Another Marine shot his friend -- apparently accidentally -- in the head.  He had known the friend since basic training.  (<u>Id.</u>).[6]

---

[5]     During the Vietnam War, a Vietnamese radio personality for Radio Hanoi nicknamed "Hanoi Hannah" made English-language broadcasts directed at U.S. soldiers.  <u>See</u> Philip Shenon, <u>Ho Chi Minh City Journal; Hanoi Hannah Looks Back, With Few Regrets</u>, N.Y. Times, Nov. 26, 1994, at A4 ("For a generation of American troops at war in Indochina, Mrs. Ngo was Hanoi Hannah, the silky-voiced announcer on North Vietnamese radio, the Voice of Vietnam, who tried to convince American G.I.'s that the war was immoral, that they should lay down their arms and go home.").

[6]     Dr. Larson, Lawson's expert witness, described how Lawson recalled the incident during an interview in 2010:  "One particularly traumatizing event [] Mr. Lawson mentioned was seeing one of his closest buddies . . . die in his presence from a gunshot wound to the head.  As he stated, '. . . his head was just gone.'  He showed tears and his voice broke as he described this incident, demonstrating that the recollections of this and other combat related traumatic events were still capable of triggering strong emotional reactions decades later."  (LX 12 at 2).

While in Vietnam, for the first time in his life, Lawson began using illegal narcotics -- opium.  (Id. 33).  Opium was "cheap" and readily available in Vietnam, and many Marines resorted to smoking opium to take "the edge off."  (Id. 34).  As Lawson testified:

> Q.   What effect did it have on you?
>
> A.   Well, actually, I didn't feel any effect.  I just -- I didn't know what the experience -- I didn't know what it was.  I just -- I smoked it.  And I didn't know what I was doing.  I just smoked [it] . . . and then, after awhile, I realized it was -- it was having an effect on me.  I felt a little less scared and --
>
> Q.   Did you continue to use it?
>
> A.   Yes.

(Id.).

Alcohol, in the form of beer, was also readily available to Marines during this time in Vietnam.  The Marine Corps dropped beer by parachute to Marines in the field.  There was so much beer that Lawson would make "a bed of beer," sleeping on beer to be elevated off the ground, to get away from snakes, centipedes, and other "little crawly things."  (Id. 34-35).  Drinking beer became a "habit" for Lawson in Vietnam.  (Id. 35).

Lawson returned to the United States from Vietnam in 1966. (Id. 36). He remained in the Marine Corps until 1967, when he was honorably discharged. (Id. 36).[7] He received numerous medals and commendations for his service, including the Vietnam Service Medal, the National Defense Service Medal, the Vietnam Campaign Medal, the Marine Corps Good Conduct Medal, a Presidential Unit Citation, and the Navy Commendation Medal. (Id. 35-36; LX 6 at 2).

## C.   **Lawson's Difficulties Readjusting**

Vietnam affected Lawson in "many ways."  (Tr. 37). Upon his return, he was "scared of everything" and would "jump" at "every little noise." (Id.). He experienced nightmares and flashbacks relating to his time in Vietnam. (LX 12 at 2). His Vietnam experience "scarred [him] for life." (PX A ¶ 10).

Lawson had difficulty finding a job, but finally found work in the garment industry in early 1968. (Tr. 37-38). He was generally employed during the 1970s, continuing in the garment industry and working as well at Hunts Point and as a super in the Bronx. (Id. 38). He also periodically visited his father in Jamaica, helping on his father's farm. (Id. 38-39).

---

[7]   Lawson continued in the Marine Corps Reserves until 1970. (LX 6).

Unfortunately, Lawson continued to use drugs.  He had become "habituated to drugs" in Vietnam, and upon his return he smoked marijuana and PCP and even used heroin for a while.  (Id. 39-40; PX A ¶ 10 ("I came back from Vietnam addicted to opium.")).  He also continued drinking, because he had been having difficulty falling asleep.  (Tr. 40).  He testified:

> Ever since I came back from Vietnam, I couldn't fall asleep.  Even now I can't fall asleep.  I have to take medications just to fall asleep at night.  And, back then, I didn't know what was going on.  I didn't go to veteran hospital, I didn't -- I was not getting any medical attention.  I didn't get medical treatment.  I was like self medicating myself.  I -- the only thing could put me to sleep was alcohol.  Two or three cans of beer and I would fall asleep.  But two or three cans of beer would only make me sleep for about three hours.  And I get up and drink three or four more cans and I would sleep for another three hours.  And that went on and on until I ended up in veterans hospital, where I told my problem and they started giving me medication for sleep.

(Id. 40-41; see also LX 12 at 2 ("Mr. Lawson also recalled feeling the need to numb the painful and intrusive memories, which led to his pattern of substance abuse."); PX A ¶ 11).[8]

---

[8]     Substance abuse is a common form of "self-medication" among untreated sufferers of PTSD.  See Leslie K. Jacobsen et al., Substance Use Disorders in Patients with Posttraumatic Stress Disorder, 158 Am. J. Psychiatry 1184, 1185 (2001) (LX 27); Paige Ouimette et al., Modeling Associations between

At some point, Lawson was living "on the street" because of his addiction.  (PX A ¶ 12).  He did not seek medical assistance from the Veterans Administration (the "VA") until the 1980s.  (Tr. 41).[9]  He also continued to suffer from back pain, as a result of injuries sustained in Vietnam (LX 3 at 1-3), and found that drugs and alcohol eased this pain as well (LX 12 at 2).  Lawson tried to address his drug problem, first by isolating himself in his apartment for a week and then putting himself in a "mental hospital" for two weeks in the early 1980s.  (Tr. 40, 46).

Although it was not diagnosed until later, after he returned from Vietnam Lawson suffered from post-traumatic stress disorder ("PTSD").  (LX 12 at 2; see Tr. 138).[10]  He was

_____

Posttraumatic Stress Symptoms and Substance Use, 35 Addictive Behaviors 64, 64 (2010) (LX 28).

[9]   It is common for returning veterans to go decades without seeking treatment for PTSD.  (Tr. 138; see generally Richard A. Kulka et al., Trauma and the Vietnam War Generation (Brunner/Mazel 1990) (LX 25)).

[10]   As Dr. Larson testified, PTSD was accepted as a diagnosis for mental disorder only in 1978.  (LX 12 at 2).  See generally Matthew J. Friedman, U.S. Dep't of Veteran Affairs, Posttraumatic Stress Disorder: An Overview, http://www.ptsd.va.gov/professional/pages/ptsd-overview.asp (noting that PTSD was added to the Diagnostic and Statistical Manual of Mental Disorders (DSM-III) in 1980).

diagnosed with PTSD in 1979, but the record is unclear by whom or where, and in any event he did not receive medical help.  (PX A ¶ 13).  In 1998 Lawson applied for disability benefits and, in 2002, the VA -- which by then had been recast as the Department of Veterans Affairs (the "Department") -- awarded him benefits for his back condition and PTSD.  (Tr. 89-90; LX 3 at 1).  The Department concluded that both conditions were "directly related to military service," that is, his service in Vietnam.  (LX 3 at 2, 3).[11]

## D.   **Tragedy**

In 1981, Lawson married Vena May Campbell.  (Tr. 47). In 1985, however, that marriage ended with her death:  Lawson stabbed and killed her.  (Id. 48-50).

Lawson had been living separately from his wife.  (Id. 48).  They were trying to reconcile, however, and in April 1985, Lawson met her so that they could look at a new apartment where they might try to live together again.  (Id. 48-49).  They started quarreling, and Lawson stabbed her multiple times in the chest and stomach with a knife.  (Id. 49; GX H).  He immediately

---

[11]    Lawson was awarded benefits retroactively to 1998.  He had not applied earlier for benefits because he had not known earlier that he could.  (Tr. 89-90; LX 4).

walked to a police station, reported his crime, and was arrested.
(Tr. 49-50).

The night before, Lawson had been drinking and smoking
marijuana laced with PCP.  (Id. 48).  He was still under the
influence of alcohol and drugs when he went to see his wife.
(See Tr. 48, 51).  He was also still suffering from PTSD, and
this condition was a contributing factor in his killing his wife.
(Id. 138-39).[12]

In 1986, a state court jury found Lawson not guilty of
murder but convicted him of first-degree manslaughter, finding
that he had acted under "extreme emotional disturbance."  (GX J).
He was sentenced to a term of ten to twenty years in prison.  (GX
K).

Lawson testified:

Q.  Sitting here today, how do you feel
about what you did?

A.  I don't think words can describe how I
feel [about] what I did.  I could never, in a
million years, live that down.

_____

[12]    As Dr. Larson testified, "it is fairly common for men
who have been trained to be violent and who come back from combat
exposure with PTSD to resort to violence when under stress,
particularly if it is magnified by substance abuse.  But even
sometimes when it is not magnified by that, it is not an uncommon
thing for a veteran to respond violently in a situation of great
stress."  (Tr. 140).

Q.   How does it feel to talk about it?

A.   Not very good.

Q.   Are you sorry that you did that?

A.   Excuse me?

Q.   Are you sorry that you did that?

A.   Sorry is too easy a word.

Q.   What happened to you as a result of what
you did that day?

A.   Yes.

Q.   Sorry?

A.   Yes.

Q.   What happened to you as the result?

A.   My life is what it is, as a result of
what I did.  My time in prison, my misery.

        Part of being unable to sleep at night.
Part of my punishment, I suppose.

(Tr. 49-50).

## E.   **Lawson Serves His Sentence**

        In prison, Lawson started reflecting upon his life.

(Id. 51).  He was determined to do something about his temper and

to stop using drugs.  (Id.).  He also realized that he had to get

an education, as he testified, "to understand what was going on

in my life and understand what I did."  (Id.).

-14-

Although both were available to him in prison, Lawson stopped using illegal drugs and alcohol.  (Id. 51-52).  He obtained his General Equivalency Diploma, then an Associate's Degree (with honors), and then a Bachelor's Degree (in sociology, again, with honors).  (Id. 53-54; LXs 2, 8).  He completed training or courses in the teacher assistant education program, peer counseling, mediation, and computer and office skills.  (LX 2 at 10, 12, 15, 16).  Throughout his time in prison, he worked as a teacher's assistant, teaching algebra and English to other inmates.  (Tr. 54-55).  He was able to receive medical treatment on a regular basis.  (LX A ¶ 16).  He also served as a peer counselor, counseling fellow inmates on drug use, negative behavior, and controlling their tempers.  (Tr. 55).

**F.   <u>Lawson Returns to Society</u>**

After more than thirteen years in prison, Lawson was released on parole in August 1998.  (Id. 57).[13]  Thereafter, he complied with all the conditions of his parole.  (Id.).  A parole discharge summary reported in September 2001 that Lawson "has made a good adjustment as a productive individual into society

---

[13]   Lawson was taken into custody in April 1985 when he turned himself in to the police.  (Tr. 49-50).  Hence, he was in prison from April 1985 until August 1998, more than thirteen years.

. . . . He has not had any infractions during his supervision."
(LX 4 at 4). He received another favorable report in September
2003, but, because of the violent nature of his crime, he was not
discharged from parole until the maximum discharge date, April
29, 2005. (GX O at 1, 7, 9-11, 14).

After his release from prison, Lawson started receiving
treatment for his PTSD from the VA, including regular counseling
and medication. (Tr. 57-58). The treatment helped keep "some of
[his] nightmares down," and sleep medication also helped him
sleep better. (Id. 59). Nonetheless, he still suffers from PTSD
and continues to receive treatment and medication today. (Id.
134; PX A ¶ 33). He has not used illegal drugs since 1985, and
has ceased abusing alcohol. (Tr. 59). He also participated,
after his release, in an outpatient substance and alcohol abuse
program at a clinic for ten months. (Id. 68-69).

After completing the program, Lawson found gainful
employment. He worked as a car salesman for a little over a
year. (Id. 68; GX A at 5). Then, in October 2000, he began
working as a substance and alcohol abuse counselor at the Dr.
Martin Luther King, Jr. Health Center at Bronx Lebanon Hospital.
(Tr. 66, 69; GX A at 5). He worked with thirty-five patients at

-16-

a time, drawing on his own experiences.  (Tr. 70).  As he
explained:

> I gave an example of my life to patients and
> what I went through with alcohol and drugs.
> And it helped a great deal with patients when
> I showed them what happened in my life with
> drugs, and what drugs did to my life.

(Id.).  Lawson was liked by both co-workers and patients, and he
had a knack for calming down and working with difficult patients.
(Id. 71-73, 159-61, 163-64; see LX 7).  He helped hundreds of
individuals address their addictions, depression, and mental
illnesses, in both group and individual therapy sessions.  (Tr.
66-67, 70-71, 155-56, 158-61; PX A ¶ 22).  He helped take drug
addicts off the street.  (PX A ¶ 22).  He remained in the job for
more than eight years, retiring in November 2008 because of
health issues:  he had suffered two strokes, had fallen down a
flight of stairs, and had problems with his lower back,
shoulders, and knees.  (Tr. 66, 72, 154; LX 9).

        After prison, Lawson returned to live with his mother,
in the same apartment in Harlem.  (Tr. 57).  She had health
issues and had become immobile because of a tumor; Lawson took
care of her.  He took her to all her doctors' appointments, and
he cooked, shopped, and performed other household chores for her,

helping her with all her needs.  (Id. 84-86, 109-10).  She died in 2003.  (Id. 57).[14]

         After retiring from his position at the clinic, Lawson has spent his time playing chess (as a member of the St. Nicholas Avenue chess club) and reading.  (Id. 73, 112).  He goes to church every Sunday; he has been going to the same church on Convent Avenue in Manhattan for some fifty years (with the exception of his time in Vietnam and in prison).  (Id. 82-83).[15]

---

[14]    Lawson's brother testified as follows:

> He was her caretaker or caregiver at the
> time.  Because my mother was getting along in
> age and was getting very, very sickly and
> unable to, you know, do routine things around
> the house.  So he was the one that [was]
> doing them for her, doing her banking and any
> outside detailing that had to be done.  Like
> getting groceries and stuff like that. . . .
> [A]fter a period of years, he was actually
> taking care of her completely.

(Tr. 110).  Lawson's brother became a U.S. citizen himself by joining the Navy and taking advantage of the special naturalization procedures for servicemen.  (Id. 97).  He was in the Navy on active duty for six years and then remained in the Navy reserves for thirty years.  (Id. 98).  He worked two jobs at the same time for decades:  teaching for the New York City Board of Education for some 28 years and working for the Metropolitan Transit Authority for 37 years.  (Id. 101).

[15]    While in prison, Lawson attended church services "every Sunday."  (Tr. 82).  He "[n]ever missed" because he looked forward to attending service.  (Id.).

His mother also was "a habitual church goer."  (Id. 92).   In addition to attending services on Sundays, Lawson volunteers at church approximately three times a month, including cooking meals (e.g., curry goat and curry chicken with rice and peas) for activities and events such as fundraisers.  (Id. 83-84, 86-87).

Lawson's mother tended a flower garden in front of their apartment building.  He took it over after her death, and for several years he has been taking care of it in the summers. (Id. 84).  He has also tried to help homeless ex-servicemen in the park by taking them leftover food from the church.  (Id. 86).

Lawson has seven children, all adults now.  (Id. 43).[16] He speaks regularly with his son who lives in Canada.  (Id. 43-44).  He also keeps in touch with one other son, but does not have regular contact with his other children.  (Id. 44).  His youngest child is thirty-one years old and lives in Jamaica. (See id. 44-45).

## G.   **Lawson's Later Use of Alcohol**

At his deposition in this case, taken by the Government on July 21, 2010, Lawson testified that he did not "drink normally" and that he did not "drink anymore."  (Lawson Dep. 41).

---

[16]     Lawson has been married three times, including his marriage to Vena May Campbell.  (PX 1 at 5).

He testified that, with the exception of an incident in 2007 (discussed below), he had not had alcohol or "any drink" since 1985.  (Id. 42).  He testified that he did not have "any drinks" when he was present at "social occasions" when other people were drinking.  (Id. 41-42).  When asked if he had had anything to drink since the 2007 incident, he responded "No."  (Id. 79; see also Tr. 184).

          In fact, Lawson has consumed alcohol from time to time since his release from prison.  He has had wine and beer at family gatherings.  (Tr. 59-61, 113, 116; cf. id. 126-27).  He did not acknowledge this fact at his deposition.

          Lawson did acknowledge at his deposition that on December 23, 2007, he was arrested for operating a motor vehicle while intoxicated ("DWI").  (GX M).  The DWI charges were dismissed on motion of the district attorney in April 2009.  (GX N).  Nonetheless, Lawson admits that he consumed alcohol the night of December 23, 2007:  he was drawn into a bar by "some nostalgic reggae music" and had three glasses of white rum diluted with water.  (Tr. 62-63, 77).  He felt "a little tipsy," but nonetheless drove his car five blocks home.  (Id. 63, 77-78).  While waiting in the car for his then-wife and son-in-law to come down and park the car for him, he fell asleep.  A police officer awakened him and arrested him for DWI.  (Id. 63-64).

During his interview with Dr. Larson, Lawson disclosed the 2007 DWI incident, but denied having had any alcohol since. (<u>Id.</u> 147 (quoting Larson Dep. 67)).  Lawson did not tell Dr. Larson that he had an occasional beer or glass of wine at family gatherings, but Dr. Larson testified that this was not of concern to him because his concern was whether Lawson engaged in "a pattern of drinking" that would reflect "a substance abuse problem," that is, "whether there was a pattern of abusive drinking."  (<u>Id.</u> 148, 150).  He was not concerned about whether Lawson had "incidental social drinks."  (<u>Id.</u> 148).

## PROCEDURAL HISTORY

In 1986, the State of New York notified the Immigration and Naturalization Service ("INS") that Lawson had been convicted of first-degree manslaughter.  (LX 15).  In 1997, INS prepared -- but did not file -- a Notice to Appear charging Lawson with deportability as an alien convicted of first-degree manslaughter. (LX 16).  In 1998, Lawson applied to INS for a replacement alien registration card because his original had been destroyed by the Property Department in the Bronx Criminal Court House.  (LX 18 at 2).  INS granted the application.  (<u>Id.</u>).

In 2004, six years after Lawson was released from prison, Immigration and Customs Enforcement ("ICE") initiated

removal proceedings against him.  (LX 19).[17]  In October 2008, an

Immigration Judge ordered Lawson removed from the United States,

and in October 2009, the Board of Immigration Appeals dismissed

Lawson's appeal.  (See GX C).  The order of removal became final

in April 2010, when the Second Circuit dismissed Lawson's

petition for review.  Lawson v. Holder, No. 09-4563-ag (2d Cir.

Apr. 8, 2010).

     Meanwhile, on August 4, 2006,[18] Lawson filed an

application for naturalization pursuant to § 329 of the

Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1440, a

provision that applies only to wartime veterans of the United

States military.  (GX B).[19]  USCIS denied the application on

January 8, 2009.  (LX 21).  The agency advised Lawson --

erroneously, as discussed below -- that he was precluded "from

---

[17]     Effective March 1, 2003, responsibility for immigration
enforcement was transferred from INS to ICE.  See Homeland
Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov.
25, 2002).

[18]     Although Lawson signed and submitted the application on
August 2, 2006 (PX 1 at 1, 11), USCIS stamped it as received on
August 4, 2006 (GX B at 1).  Thus, his application is deemed
"filed" on August 4, 2006, the date it was stamped.  See 8 C.F.R.
§ 103.2(a)(7)(1).

[19]     Lawson had applied for naturalization once before, on
November 4, 2004.  USCIS denied that application without
prejudice in a decision dated September 30, 2005.  (GX A).

establishing good moral character because, during the period for which good moral character is required to be establish[ed], [he] remained, or [is], one who at any time has been convicted of an aggravated felony." (LX 21 at 7). USCIS's decision further concluded that even if the aggravated felony bar did not apply, Lawson had failed to establish the "good moral character necessary for naturalization" because of "the adverse factors of [his] manslaughter conviction, [his] criminal sentence of ten to twenty years' imprisonment, and [his] recent [DWI incident]."

The decision was summarily affirmed upon administrative appeal on August 21, 2009. (LX 22). That decision advised Lawson that "you cannot establish that you are legal permanent resident of United States," an assertion that was apparently based upon the pendency of removal proceedings against him. (Id.). As discussed below, however, Lawson's status as a lawful permanent resident was not relevant to his application for naturalization.

Lawson timely filed the instant petition for de novo review on December 15, 2009. See 8 U.S.C. § 1421(c). The parties conducted discovery, including depositions. Lawson was deposed on July 21, 2010. The Court held a hearing on August 16, 2010. Four witnesses testified on the petitioner's behalf:

-23-

(1) Lawson himself; (2) his brother, David Lawson; (3) his former

colleague, Deborah Thompson-Dougherty; and (4) a psychologist,

Dr. Paul C. Larson.  The Government did not call any witnesses.

**DISCUSSION**

**A.   Applicable Law**

Lawson petitions to be naturalized under § 329(a) of

the INA, which provides in pertinent part:

> Any person who, while an alien or noncitizen
> national of the United States, has served
> honorably . . . in an active-duty status in
> the military, air, or naval forces of the
> United States during either World War II or
> during [specified time periods during which
> there have been military hostilities] and
> who, if separated from such service, was
> separated under honorable conditions, may be
> naturalized as provided in this section
> . . . .

8 U.S.C. § 1440(a).

The United States has long had a tradition of providing

"special naturalization benefits," including expedited

proceedings, for non-citizens who have served in the United

States armed forces.[20]  In 1862, Congress approved "military

---

[20]   Non-citizens have served in the United States military
since as early as the Revolutionary War, when German and Irish
nationals fought in General Washington's armed forces.  Deenesh
Sohoni & Amin Vafa, The Fight to Be American: Military
Naturalization and Asian Citizenship, 17 Asian Am. L.J. 119, 125-
26 (2010).

naturalization" for non-citizens who enlisted during the Civil
War.  Act of July 17, 1862, Ch. 200, § 21, 12 Stat. 594, 597
(July 17, 1862) (shortening period of residency from five years
to one year); see also, e.g., S. Rep. No. 90-1292 (1968), as
reprinted in 1968 U.S.C.C.A.N. 4517 (extending expedited
naturalization to aliens serving in the "Vietnam hostilities");
Exec. Order No. 12,939, 59 Fed. Reg. 61231 (Nov. 22, 1994)
(extending expedited naturalization to aliens serving in the
"Persian Gulf conflict"); Exec. Order No. 13,269, 67 Fed. Reg.
45287 (July 3, 2002) (extending expedited naturalization to
aliens serving "during the period of the war against terrorists
of global reach").  The purpose of this policy is to "express the
gratitude of the country toward aliens who render service in its
armed forces in its defense."  Tak Shan Fong v. United States,
359 U.S. 102, 107 (1959).

        Although § 329 of the INA does not explicitly contain a
"good moral character" requirement, the statute incorporates that
requirement from § 316, the general naturalization provision of
the INA, 8 U.S.C. § 1427.  See Boatswain v. Gonzalez, 414 F.3d
413, 417 (2d Cir. 2005) ("[A]pplicants under § 1440 must
demonstrate good moral character if they hope to be naturalized
as U.S. citizens.").  The implementing regulations require that

veterans seeking naturalization establish "good moral character"
during the period beginning one year before the application's
filing, and continuing until the administration of the oath of
allegiance.  See 8 C.F.R. §§ 316.10(a)(1), 329.2(d).  The
applicable regulation provides in pertinent part:

> To be eligible for naturalization under
> section 329(a) of the Act, an applicant must
> establish that he or she:
>
> (a)  Has served honorably . . . in an active
> duty status in the Armed Forces of the United
> States during . . . [t]he period beginning on
> February 28, 1961 and ending on October 15,
> 1978; . . .
>
> (b)  If separated has been separated
> honorably . . . ;
>
> (c)  Satisfies the permanent residence
> requirement [by becoming lawfully admitted to
> the United States as a permanent resident
> after enlisting or by being physically
> present in the United States when enlisting];
>
> (d)  Has been, for at least one year prior to
> filing the application for naturalization,
> and continues to be, of good moral character,
> attached to the principles of the
> Constitution of the United States, and
> favorably disposed toward the good order and
> happiness of the United States; and
>
> (e)  Has complied with all other requirements
> for naturalization as provided in part 316 of
> this chapter, except [that compliance is not
> required in certain enumerated respects]
> . . . .

8 C.F.R. § 329.2.

This Court's review of a denial of a petition for naturalization is de novo, and "the court shall make its own findings of fact and conclusions of law and shall, at the request of petitioner, conduct a hearing de novo on the application."  8 U.S.C. § 1421(c).  The petitioner bears the burden of proof. Berenyi v. INS, 385 U.S. 630, 636 (1967).  He must establish "his eligibility for citizenship in every respect."  Id. at 637.  Any doubt is to be resolved against the petitioner and in favor of the United States.  Id.

Certain acts constitute an absolute bar to a claim of good moral character.  For instance, an applicant "shall be found to lack good moral character" if he has been convicted of (1) murder at any time or (2) an aggravated felony on or after November 29, 1990.  8 C.F.R. § 316.10(b)(1)(i), (ii) (emphasis added).  Additionally, an applicant is barred who -- during the statutory period -- commits a crime of moral turpitude, violates a law relating to controlled substances, or "give[s] false testimony to obtain any benefit [under the INA], if the testimony was made under oath or affirmation and with intent to obtain an immigration benefit."  8 C.F.R. § 316.10(b)(2)(vi).  To be disqualifying, the false testimony must be made with the "subjective intent of thereby obtaining immigration or

naturalization benefits." Kungys v. United States, 485 U.S. 759, 782 (1988).  As long as an applicant possesses that intent, the bar applies, even if the misrepresentation is ultimately immaterial.  See 8 C.F.R. § 316.10(b)(2)(vi).  Misrepresentations that are made for other reasons, however -- such as "embarrassment, fear, or a desire for privacy" -- are not sufficiently culpable to "brand the applicant as someone who lacks good moral character." Kungys, 485 U.S. at 780.

Finally, unless an applicant establishes "extenuating circumstances," he shall be found to lack good moral character if, during the statutory period, he willfully fails to support dependents, has an extramarital affair, or commits an "unlawful act" that adversely reflects upon his moral character.  8 C.F.R. § 316.10(b)(3).

Apart from the enumerated bars, the requirement of "good moral character" is "incapable of exact definition." Posusta v. United States, 285 F.2d 533, 535 (2d Cir. 1961). Claims of good moral character are evaluated on a "case-by-case basis," in light of "the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2).[21]  Whatever

---

[21]     The task of determining whether an individual is of "good moral character" is a daunting one.  Judge Learned Hand

"good moral character" means, "[w]e do not require perfection in our new citizens." Klig v. United States, 296 F.2d 343, 346 (2d Cir. 1961).

Moreover, although the statutory period begins one year prior to the date of application, earlier conduct of applicants may be relevant and should be considered. See 8 U.S.C. § 1427(e); 8 C.F.R. § 316.10(a)(2); see also Santamaria-Ames v. INS, 104 F.3d 1127, 1130 (9th Cir. 1996) ("The INS and the district court may consider conduct prior to the one-year regulatory period in determining whether an otherwise qualifying veteran has established the requisite good moral character to merit naturalization."); Cacho v. Ashcroft, 403 F. Supp. 2d 991,

---

recognized, in a case involving whether a petitioner who had engaged in sexual intercourse with unmarried women was of good moral character, that judges cannot "take a poll" or "conduct an inquiry as to what is the common conscience." Schmidt v. United States, 177 F.2d 450, 451 (2d Cir. 1949). Rather, he observed, we judges must "resort to our own conjecture, fallible as we recognize it to be." Id. As Professor Rosenbaum has written, "[N]o one has the last word on morality, or even on knowing what is moral -- including judges themselves. No one's credentials on the question of good moral character are superior to anyone else's, and no one's opinion on the matter should be more influential than another's." Thane Rosenbaum, The Myth of Moral Justice 162 (2004). No matter how difficult the task, however, by law the responsibility is given to us as judges, and we must do the best we can, based on the record presented.

996 (D. Haw. 2004).[22]  "[The applicants'] past is of course some index of what is permanent in their makeup, but the test is what they will be, if they become citizens."  <u>Posusta</u>, 285 F.2d at 536.  Conduct pre-dating the statutory period, however, cannot by itself preclude a finding of good moral conduct during the statutory period.  <u>Santamaria-Ames</u>, 104 F.3d at 1132.  Indeed, "evidence [of pre-statutory period conduct] may be considered in so far as it throws light upon the character of the applicant in the probationary period."  <u>Posusta</u>, 285 F.3d at 535.

**B.    <u>Application</u>**

The only dispute before the Court is whether, during the statutory period, Lawson has been of good moral character. He otherwise meets the requirements of § 329(a) and the

---

[22]    The USCIS Adjudicator's Field Manual explains:

> [C]onduct prior to [the statutory] period may impact the adjudicator's decision regarding whether or not an applicant meets the requirement [of good moral character]. . . . Thus, when addressing the issue of good moral character, the examination should be broad enough and sufficiently detailed to disclose all relevant adverse conduct or activity. Although the focus should be on conduct during the statutory period, the inquiry should extend to the applicant's conduct during his or her entire lifetime."

(LX 23 at 1).

implementing regulations:  he was physically present in the United States when he enlisted in the Marine Corps; he served on active duty during the period of the Vietnam hostilities; he was discharged honorably; and he is (and the Government has not suggested otherwise) "attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States."  8 C.F.R. § 329.2.

The parties do dispute, however, whether Lawson is of good moral character.  I proceed with the inquiry in two steps. First, I consider whether Lawson is precluded by any statutory bar from asserting "good moral character."  I conclude that he is not.  Second, I consider the issue of good moral character.  I conclude that Lawson has been and continues to be a person of good moral character.

1.  **The Statutory Bars**

Two statutory bars require discussion.  First, in the administrative proceedings, USCIS argued that Lawson was barred from claiming good moral character because of his 1985 conviction for killing his wife.  (LX 21 at 7).  Second, the Government argues in these proceedings that Lawson is statutorily barred from claiming good moral character because he committed perjury

-31-

at his deposition (which was taken on July 21, 2010, within the statutory period) by lying about his drinking.  (Tr. 17, 168-72). There has been no suggestion that Lawson is subject to any other statutory bar.  See 8 C.F.R. § 316.10(b)(2).  Hence, I discuss only the two statutory bars in question.

### a.   __The Conviction__

USCIS was plainly wrong in its invocation of the statutory bar for an aggravated felony conviction.  The Government does not even seek to defend the position in these proceedings.

Lawson is not barred from claiming good moral character by virtue of 8 C.F.R. § 316.10(b)(1)(i) or (ii).  He was not convicted of murder; indeed, the jury acquitted him on the murder count.  (GX J).  Although Lawson was convicted of an aggravated felony -- manslaughter in the first degree -- he was convicted in 1986.  (GX K).  Hence, the statutory bar for a conviction for murder or for an aggravated felony on or after November 29, 1990 does not apply.

### b.   __The Purported Perjury__

The Government now contends that Lawson is barred from claiming good moral character because he committed perjury at his deposition in this case, and he did so for the purpose of

-32-

obtaining an immigration or naturalization benefit.  I reject

both contentions.  Although there are some discrepancies between

Lawson's deposition testimony and the evidence presented at the

hearing, I am not persuaded that Lawson intentionally gave false

testimony at his deposition or that, even assuming he did, he did

so to obtain an immigration or naturalization benefit.

First, I accept Lawson's testimony that he did not

understand the Government to be questioning him at his deposition

about his having an occasional glass of wine or beer at family

gatherings.  As he testified:

> Well, depending on what you call alcohol,
> because sometime you go to family gathering,
> and alcohol, we consider alcohol to be like
> hard rum, rum is alcohol and whiskey is
> alcohol.  And hard liquor is alcohol.  But at
> a family gathering when you drink a glass of
> wine with your turkey or with steak or
> something like that, or if you go to church
> or communion and you have a sip of wine at
> communion, we don't consider that to be
> drinking.

(Tr. 78).  In the context of the questions in the deposition, I

conclude that Lawson interpreted the words "drinking" and

"drinks" to mean "hard liquor" in the context where "people sit

around and drink."  (Id. 79).  As Dr. Larson suggested, Lawson

understood the deposition questions to be about abusive drinking,

the kind of drinking he engaged in years earlier and again on one

-33-

occasion in 2007.  (Compare id. 78, 79 ("I don't sit around in social places and drink.  I don't go to a bar and drink.  I don't sit in a park and drink."), with id. 148-50).[23]

Second, Lawson had no reason to lie about having an occasional beer or glass of wine at family gatherings.  As the Government acknowledges, drinking an occasional beer or glass of wine does not destroy one's good moral character.  (Id. 171-72). If Lawson had understood the questions properly at his deposition, there would have been no reason for him to lie about the fact that he had a beer or glass of wine at family gatherings.  While there is no materiality requirement for perjury to constitute a statutory bar, the courts have recognized that some misstatements are so "small," "trivial," and "inconsequential" that they will not preclude an applicant from claiming good moral character.  In re Zele, 140 F.2d 773, 776 (2d Cir. 1944).[24]

---

[23]    This distinction is reasonable, especially in light of Lawson's past substance abuse.  The two activities are very different.  Abusive drinking is what Lawson used to do in the 1970s and 1980s -- drinking to get drunk; drinking to help cope with his pain and suffering; and drinking as an activity in and of itself.  Drinking a glass of wine or beer at a meal with family is what countless adults do on a regular basis.

[24]    Accord Kliq, 296 F.2d at 347 (holding that petitioner's false testimony concerning his Communist Party activities twenty-

Third, even assuming Lawson intentionally answered falsely, it is more likely that he did so because of "embarrassment, fear, or a desire for privacy," than because he was seeking to obtain an immigration or naturalization benefit. Kungys, 485 U.S. at 780; cf. United States v. Hovsepian, 422 F.3d 883, 887 (9th Cir. 2005) (inaccurate statements attributable to "misinterpretation of the question" or "innocent mistake" are not subject to perjury bar). As noted, an occasional drink at a family gathering obviously would not have disqualified him from becoming a citizen. Moreover, he filed the instant naturalization application in August 2006, and in the nearly six years since he has been represented by counsel. I simply do not believe that he thought he could help his application by lying -- at his deposition, three weeks before the hearing in this case -- about having a glass of wine or a beer "with [his] turkey or with steak" at a family dinner. (Tr. 78). His purported misstatements were "not sufficiently culpable to brand [him] as

---

plus years earlier was "too insignificant to furnish an adequate basis for [the district court] to have found that petitioner intended to testify falsely and did so in order to obtain a benefit under the [INA]"); cf. Chaunt v. United States, 364 U.S. 350, 353-54 (1960) (rejecting Government's efforts to denaturalize individual who falsely denied ever having been arrested when he had been arrested three times, where arrests were made "some years" prior to statutory five-year period).

someone who lacks good moral character."  Kungys, 485 U.S. at 780.

In short, Lawson is not statutorily barred from claiming good moral character.

### 2.    **The Question of Good Moral Character**

I turn to the principal question:  whether, from August 4, 2005, and continuing, Lawson has been and still is a person of good moral character.  Of course, Lawson's earlier conduct may be relevant and must be considered.

I hold that Lawson has carried his burden.

While in prison and after his release, Lawson turned his life around completely.  He addressed and overcame his drinking and drug problems.  He obtained treatment for his PTSD. He became a productive and responsible member of society.  He educated himself, earning three degrees while in prison, completing training courses, and learning how to be a counselor while he was receiving counseling himself.  In prison and after his release, he counseled countless inmates and other individuals, helping them address their addictions and other problems, drawing on the very effective tool of his own experiences.  He completed his seven years of parole without incident.  He obtained gainful employment and worked steadily in

-36-

the same job for eight years, until his physical problems caused him to retire.  He paid taxes.  (PXs F, G).  He took care of his elderly mother.  He went to church every Sunday and helped as a volunteer.  He took food to homeless veterans in the park.  He read and played chess in a chess club.  He tended a neighborhood flower garden, taking over for his mother after she died.  With one minor exception in 2007, he had no encounters with the law and never reverted to abusive drinking.

Of course, Lawson committed an unspeakable act when he killed his wife.  But that was more than twenty-five years ago, and he has paid for his actions.  Not only did he serve thirteen years in prison and seven years on supervision, he has been punished with the memories of his abhorrent act.  Moreover, there were mitigating circumstances, as his actions were caused at least in part by his untreated PTSD and substance abuse.  See California v. Brown, 479 U.S. 538, 545 (1987) ("[T]his society [has long held the belief] that defendants who commit criminal acts that are attributable to . . . emotional or mental problems may be less culpable than defendants who have no such excuse.") (O'Connor, J., concurring).

As our jurisprudence recognizes, "no man is beyond redemption."  Yuen Jung v. Barber, 184 F.2d 491, 495 (9th Cir.

1950).  Congress did not "enact[] a legislative doctrine of predestination and eternal damnation" when it imposed the good moral character requirement.  Id.  Rather, it elected to test an applicant's moral character only for a limited period, allowing for an individual to change, grow, and build his character over time.  Lawson has redeemed himself, and the manner in which he has overcome his challenges is a testament to his character.

In some respects, this case has parallels to Repouille v. United States, 165 F.2d 152 (2d Cir. 1948), where the Second Circuit was confronted with another petition for naturalization filed by someone who had committed a homicide.  The petitioner put his thirteen-year old son to death, using chloroform.  There were extenuating circumstances, as the child had been blind, mute, and deformed from birth.  The jury convicted the petitioner of manslaughter in the second degree, but recommended the "utmost clemency," and the judge imposed a sentence essentially of probation.  Id. at 153.  The Second Circuit dismissed the petition, noting that the crime had occurred within the applicable statutory period, i.e., within the five-year period prior to the filing of the petition.  Id.  The court dismissed the petition, however, without prejudice, with Judge Learned Hand writing for the majority:  "[W]e wish to make it plain that a new

-38-

petition would not be open to this objection; and that the pitiable event, now long passed, will not prevent Repouille from taking his place among us as a citizen." <u>Id.</u> 153-54.

The Government also argues that the 2007 incident demonstrates Lawson's lack of good moral character. I reject the notion. First, the charges were dropped, on motion of the district attorney. Second, although Lawson has admitted that he drank too much that evening, this was only one transgression and it was not part of any pattern of misbehavior.[25] The lapse does not spoil the quality of Lawson's moral character as a whole. <u>See</u> 8 C.F.R. § 316.10(b)(3). Third, Lawson testified forthrightly about the incident, without minimization, even though the charges had been dropped and the record sealed. (Tr. 62-66; <u>see</u> GX N ("SEALED")). If Lawson had denied going to a bar that night or denied drinking to the point of being "tipsy," the Government undoubtedly would have had difficulty proving otherwise. Fourth, even assuming Lawson was guilty of DWI that evening, the cases recognize that a single DWI conviction is usually insufficient to preclude a finding of "good moral

---

[25]     In fact, Lawson drank white rum and "filled up the glass with water . . . to dilute it out." (Tr. 63). This demonstrates that he was not someone who drank regularly. As his brother testified about such a drink, "That's ugly." (<u>Id.</u> 121).

character."[26]  The DWI incident is Lawson's sole lapse in judgment since 1986, the only mistake in what has been a remarkable turnaround in his life and character.  Again, the law does not require "perfection."  Kliq, 296 F.2d at 346; see also Posusta, 285 F.2d at 535 ("[A] person may have a 'good moral character' though he has been delinquent upon occasion in the past; it is enough if he shows that he does not transgress the accepted canons more often than is usual.").

In denying Lawson's application in the administrative proceedings and in opposing his petition in this Court, the Government has provided shifting and sometimes legally erroneous rationales.  USCIS's January 8, 2009 decision erroneously invoked the aggravated felony bar, which was not applicable to Lawson's pre-1990 conviction.  (LX 21 at 7).  The August 21, 2009 USCIS

---

[26]    See, e.g., Rangel v. Barrows, No. 07 Civ. 279 (RAS), 2008 WL 4441974, at *3 (E.D. Tex. Sept. 25, 2008) ("[A] single DWI conviction is insufficient to preclude an applicant from establishing good moral character."); Ragoonanan v. USCIS, No. 07 Civ. 3461 (PAM), 2007 WL 4465208, at *4 (D. Minn. Dec. 18, 2007) ("[A] single DWI conviction, standing alone, does not statutorily bar a naturalization applicant from establishing good moral character when he has been candid about the conviction."); Yaqub v. Gonzales, No. 05 Civ. 170 (TSH), 2006 WL 1582440, *5 (S.D. Ohio June 6, 2006) (holding that two DUI convictions do not preclude finding of good moral character, especially where applicant is "forthright"); Puciaty v. Dep't of Justice, 125 F. Supp. 2d 1035, 1039 (D. Haw. 2000) (holding that two DUI arrests do not preclude finding of good moral character).

decision affirming the original denial erroneously cited Lawson's purported lack of lawful permanent residency (LX 22 at 1), when under the statute Lawson met the lawful permanent residency requirement merely by being physically present in the United States when he enlisted in the Marines, see 8 C.F.R. § 329.2(c). The Government has abandoned these earlier positions and now seeks to deport Lawson principally on the basis of purported perjury at his July 2010 deposition.  In light of the case law and all of the compelling circumstances, the Government's latest position seems nothing but petty.

Indeed, the Government's continuing efforts to deport Lawson -- who is now sixty-five years of age -- from the country where he has lived for some fifty-one years, and its continuing efforts to deny this highly-decorated Vietnam War veteran citizenship in the country for which he so valiantly fought, are mean-spirited at worst and puzzling at best.  They betray a desire on the part of the Government to continue punishing Lawson for his actions of so long ago.

But "[t]he statute is not penal; it does not mean to punish for past conduct, but to admit as citizens those who are likely to prove law-abiding and useful."  Posusta, 285 F.2d at 535-36.  Based on my assessment of the entire record, including

-41-

Lawson's credibility and demeanor on the witness stand, and in light of the manner in which he has dealt with his "experience of trial and suffering," I hold that, since August 4, 2005 and before, Lawson has been of good moral character, and that he is likely to continue to be "law-abiding and useful."

### CONCLUSION

For the reasons set forth above, the petition is GRANTED and judgment will be entered ordering respondents to grant Lawson's petition for naturalization.  Counsel for Lawson shall submit a proposed judgment on notice forthwith.

SO ORDERED.

Dated:    New York, New York
          July 7, 2011

DENNY CHIN
United States Circuit Judge
Sitting by Designation